(No. 67049.—

ADRIENNE GEARY *et al.*, Appellants, v. DOMINICK'S
FINER FOODS, INC., *et al.*, Appellees.

*Opinion filed June 19, 1989.—Rehearing
denied September 29, 1989.*

STAMOS, J., took no part.

Anne M. Burke and Sidney Z. Karasik, both of Chicago, for appellants.

Glenn E. Schreiber, of Madigan & Getzendanner, Thomas H. Donohoe, of Martin, Craig, Chester & Sonnenschein, Michael D. Sher, of Neal, Gerber, Eisenberg & Lurie, and Sidney N. Herman and Miriam G. Bahcall, of Kirkland & Ellis, all of Chicago, for appellees Dominick's Finer Foods *et al.*

Judson H. Miner, Corporation Counsel, of Chicago (Ruth M. Moscovitch and Frederick S. Rhine, of coun-

sel), for appellees Charles Sawyer and City of Chicago.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Michael J. Wynne, Assistant Attorney General, of Chicago, of counsel), for appellee Director of the Department of Revenue.

Jacqueline Stanley Lustig, Jewel N. Klein and Linda S. Kagan, of Chicago (Mary Ellen Dienes, of counsel), for *amicus curiae* Women's Bar Association of Illinois.

JUSTICE CALVO delivered the opinion of the court:

Plaintiffs, Adrienne Geary, Marge E. Mulcahy, and Maureen E. Ryan, initiated a class action suit alleging that R. Thomas Johnson, as director of the Illinois Department of Revenue, the City of Chicago and Charles Sawyer, as director of the Chicago Department of Revenue (city defendants), and the Regional Transportation Authority (RTA) imposed illegal taxes on tampons and sanitary napkins plaintiffs purchased from Dominick's Finer Foods, Inc., Jewel Food Stores, Inc., Walgreens Company, and K mart Corporation (retail defendants). The circuit court held that the voluntary-payment doctrine did not bar plaintiffs' claims and that tampons and sanitary napkins were exempt from the Chicago sales tax; therefore, the circuit court denied defendants' motions to strike and dismiss plaintiffs' complaint. At the request of the defendants and pursuant to Supreme Court Rule 308(a) (107 Ill. 2d R. 308(a)), the circuit court certified three questions for review. The appellate court consolidated the questions into the following two issues: (1) whether plaintiffs sufficiently pleaded duress under the voluntary-payment doctrine when they alleged that tampons and sanitary napkins were necessities; and (2) whether tampons and sanitary napkins were "medical appliances" under the Chicago Sales Tax Ordinance (Chicago Municipal Code §200.6—1 *et seq.* (1984)) and thus

exempt from that tax. The appellate court reversed the circuit court on the first issue, but did not address the second issue. We granted plaintiffs' petition for leave to appeal (107 Ill. 2d R. 315). Only the city and retail defendants participated in this appeal. The Women's Bar Association of Illinois, as *amicus curiae,* filed a brief in support of plaintiffs' position.

## I. Voluntary-payment Doctrine

Under the voluntary-payment doctrine, a taxpayer may not recover taxes voluntarily paid, even if the taxing body assessed or imposed the taxes illegally. (*Getto v. City of Chicago* (1981), 86 Ill. 2d 39, 48-49.) A taxpayer can only recover taxes voluntarily paid if such recovery is authorized by statute. (*Getto,* 86 Ill. 2d at 48.) A taxpayer, however, has paid the taxes *involuntarily* if (1) the taxpayer lacked knowledge of the facts upon which to protest the taxes at the time he or she paid the taxes, *or* (2) the taxpayer paid the taxes under duress. (*Getto,* 86 Ill. 2d at 48-49.) The court in *Getto* explained the voluntary-payment doctrine:

> " '[M]oney voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal. It has been deemed necessary not only to show that the claim asserted was unlawful, but also that the payment was not voluntary; that there was some necessity which amounted to compulsion, and payment was made under the influence of such compulsion.'
>
> *** Though payment under protest is the typical means by which a taxpayer signifies his contention that a tax or charge was improper, the absence of such a protest does not, without more, require application of the voluntary-payment doctrine. It must also be shown that the taxpayer plaintiff had knowledge of the facts upon which to frame a protest and also that the payments

were not made under duress or compulsion." *Getto*, 86 Ill. 2d at 48-49, quoting *Illinois Glass Co. v. Chicago Telephone Co.* (1908), 234 Ill. 535, 541.

Plaintiffs admitted that they failed to protest when they paid the taxes. The circuit court held that plaintiffs did not plead sufficient facts to show that they lacked the knowledge upon which to frame a protest. Plaintiffs, however, also alleged in their complaint that tampons and sanitary napkins were medical necessities of life, and the circuit court held that this allegation constituted a sufficient pleading of duress. Consequently, the circuit court determined that plaintiffs did not pay the taxes voluntarily and therefore held that they could proceed with their suit. The appellate court, however, reversed the holding of the circuit court on the duress issue. The appellate court held that "pleading that an item is a necessity does not constitute pleading duress" (167 Ill. App. 3d 1, 6) and, therefore, plaintiffs did not sufficiently plead that they paid the taxes involuntarily.

Before we consider the merits of the duress issue, we must first discuss two collateral issues raised by the parties. The first issue concerns who bears the burden of proving that plaintiffs paid the taxes voluntarily or involuntarily. The circuit court did not certify this issue for review (107 Ill. 2d R. 308(a)) and the appellate court did not address this issue, so it is not properly before us and we decline to consider it (see *Christopher v. West* (1951), 409 Ill. 131, 134-35). We are only concerned in the case at bar with the sufficiency of the pleading.

Second, the parties discuss at length whether plaintiffs had to protest the taxes and whether plaintiffs had sufficient knowledge to protest the taxes. The parties also dispute the form of protest plaintiffs had to make. The appellate court held that it would not decide those issues because the circuit court had not certified the issues for appeal; likewise, we will not consider those issues. (107 Ill. 2d

R. 308(a); see *Christopher*, 409 Ill. at 134-35.) In addition, whether plaintiffs had to protest the taxes is irrelevant to the issue of duress because the *absence of a protest is not enough* to establish that a taxpayer made a payment voluntarily. (*Getto*, 86 Ill. 2d at 49.) Defendants argue that plaintiffs could have filed a protest, either informally or pursuant to the State Officers and Employees Money Disposition Act (otherwise known as the Protest Fund Act) (Ill. Rev. Stat. 1985, ch. 127, par. 170 *et seq.*), but failed to do so. Regardless, according to *Getto*, plaintiffs could still proceed with their claim, if they could succeed in establishing duress alone. *Getto*, 86 Ill. 2d at 49.

We now consider whether plaintiffs' allegation that tampons and sanitary napkins are necessities is sufficient, standing alone, to plead duress under the voluntary-payment doctrine. Plaintiffs rely on two cases. In *Getto*, plaintiff challenged the method defendants used in calculating a tax imposed on telephone service. (*Getto*, 86 Ill. 2d at 42.) Defendants argued that prior to filing the suit plaintiff paid his telephone bills without protest. (*Getto*, 86 Ill. 2d at 45.) Plaintiff asserted that he made the payments under compulsion and thus involuntarily because he feared that defendant telephone company would terminate his telephone service if he did not pay the tax. (*Getto*, 86 Ill. 2d at 46.) The court stated:

> "Even were it to be held that the plaintiff had sufficient knowledge of all the facts to permit a conclusion that all payments *** were voluntary, we judge that the *implicit* and real *threat* that phone service would be shut off for nonpayment of charges amounted to compulsion that would forbid application of the voluntary-payment doctrine." (Emphasis added.) (*Getto*, 86 Ill. 2d at 51.)

The court stated further:

> "The factor of compulsion and its place in the voluntary-payment doctrine were discussed in *Illinois Glass*. It was observed by the court in 1908:

'The ancient doctrine of duress of person, and later of goods, has been relaxed, and extended so as to admit of compulsion of business and circumstances, and perhaps a telephone corporation having a system in general operation and connected with customers and other business houses might reasonably influence a business house to make an unwilling payment of an amount illegally demanded, which would make the payment compulsory. The telephone has become an instrument of such necessity in business houses that a denial of its advantages would amount to a destruction of the business.' " (*Getto*, 86 Ill. 2d at 52, quoting *Illinois Glass*, 234 Ill. at 541.)

Defendants in *Getto* argued that plaintiff could have protested the tax without risking termination of his service. Under General Order 197 of the Illinois Commerce Commission, a consumer could file a complaint with the utility, only pay the undisputed portion of his or her utility bills, and then seek to resolve the dispute with the utility. If the consumer and the utility could not resolve the dispute, then the consumer could file a complaint with the Commission. (*Getto*, 86 Ill. 2d at 52-53.) The court rejected defendants' contention:

"[The tax] was sanctioned and approved by the Commission itself. *** Any attempt by the plaintiff to follow the procedural requirements in General Order 197 would obviously have been pointless and he would have been exposed to *possible* termination of service. We judge that the plaintiff is not barred under the voluntary-payment doctrine." (Emphasis added.) (*Getto*, 86 Ill. 2d at 53.)

Thus, *Getto* found telephone service a necessity such that the "implicit" (*Getto*, 86 Ill. 2d at 51) threat of and "possible" (*Getto*, 86 Ill. 2d at 53) termination of that service amounted to duress.

The *Getto* court relied on *Ross v. City of Geneva* (1978), 71 Ill. 2d 27. In *Ross*, defendant supplied electricity as a public utility. Pursuant to an ordinance, defend-

ant imposed a 10% surcharge on the electric bill of each commercial user of electricity. When plaintiff received his electric bill, he paid the surcharge but indicated on his check that he made the payment under protest. Plaintiff then sought recovery for the surcharge he paid to defendant. In holding that plaintiff did not pay the tax voluntarily, the court stated:

"In *Allison Co. v. Village of Dolton,* 24 Ill. 2d 233, plaintiff sought to recover money allegedly paid under duress to the defendant village for license and inspection fees under an ordinance which plaintiff alleged was either invalid or inapplicable to him. Relying upon *Benzoline Motor Fuel Co. v. Bollinger,* 353 Ill. 600, and *People ex rel. Carpentier v. Arthur Morgan Trucking Co.,* 16 Ill. 2d 313, the court held that payments made to avoid 'disastrous effects to business' were involuntary and that the money thus paid could be recovered. Confronted with the choice of payment of the surcharge or termination of service, plaintiff, in making the payment, acted with prudence and is not barred from recovery of the sums paid." (*Ross,* 71 Ill. 2d at 33-34.)

The *Ross* court found it important that plaintiff could only choose between paying the surcharge or having his service terminated. The court found plaintiff's need for electricity important because the termination of that service would produce disastrous results. Thus, the court held that plaintiff acted prudently by paying the surcharge rather than risking the termination of an essential service.

Unlike plaintiffs in the case at bar, plaintiff in *Ross* made his payments under protest and he showed that defendant had a policy of terminating service to those customers who failed to pay their bills. (*Ross,* 71 Ill. 2d at 33.) The *Getto* court, however, found these circumstances irrelevant or at least unimportant. (See *Getto,* 86 Ill. 2d at 57 (Underwood, J., dissenting).) The court in *Getto,* as we noted earlier, found duress even without such a protest, and the court did not require plaintiff to

show that defendant telephone company had a policy of terminating service to nonpaying customers. See *Getto*, 86 Ill. 2d at 49, 51-52.

We find *Getto* and *Ross* similar to the case at bar and controlling on the issue of duress. The appellate court in the case at bar held that *Getto* and *Ross* were "readily distinguished from the case at bar for the reason that duress was present in both instances, not because they involved services which the court deemed essential, but because the plaintiffs certainly would have had their service shut off if they had refused to pay the disputed taxes." (167 Ill. App. 3d at 5-6.) We disagree. Duress existed in *Ross* and *Getto* *not only* because the defendants would have shut off the services had the plaintiffs not paid the taxes, *but also* because those cases involved services the courts deemed essential. The relationship between those two circumstances—the nature of the service and the consequence of nonpayment of the taxes—was significant. If the service had not been a necessity or if the defendants would not have terminated the services upon nonpayment of the taxes, then clearly the *Getto* and *Ross* plaintiffs would not have suffered any duress in paying the taxes.

In the case at bar both circumstances exist. Clearly tampons and sanitary napkins are necessities of life for a vast number of post-pubescent women. These products are virtually the only ones available to and used by women during menstruation. No reasonable alternative product exists. The invention of telephones and electricity generated a reliance on those services. Likewise, the invention of tampons and sanitary napkins generated a reliance on those products. Certainly if telephones and electricity are necessities, tampons and sanitary napkins, which were created to absorb the consequences which flow from a natural biological process, are necessities.

Moreover, plaintiffs could not obtain the tampons and sanitary napkins unless they first paid the taxes. As with

the retail purchase of any product, a purchaser cannot receive the product unless he or she pays for it. Plaintiffs had to pay the taxes or do without the tampons and sanitary napkins. Similarly, plaintiffs in *Getto* and *Ross* had to pay the taxes or do without telephone or electric service.

Defendants argue that plaintiffs cannot establish duress merely by pleading that tampons and sanitary napkins are necessities. According to defendants, plaintiffs must plead that they could not purchase the products elsewhere without paying the taxes; that they could not purchase the products from the retail defendants without paying the taxes or that any attempt to do so would have been useless; that the retail defendants threatened or compelled plaintiffs to pay the taxes; or that the retail defendants had an established policy of refusing to sell the products in the event a customer refused to pay the taxes. Although the consequences of nonpayment must be considered when establishing duress, plaintiffs did not have to plead the additional facts asserted by the defendants.

First, plaintiffs did not have to allege that they could not buy the products elsewhere. To require plaintiffs to check every retail store in the city or State to determine whether they could purchase tampons and sanitary napkins from another store without paying the tax would be absurd and burdensome. In fact, plaintiffs would suffer duress if they had to choose between paying the taxes or scouring the city and State to find a retail store that would allow them to purchase tampons and sanitary napkins without paying the taxes. For the same reasons, we will not force plaintiffs to buy tampons and sanitary napkins outside the State. The law requires every retail store in Illinois to pay a State tax on the receipts collected from the sales of their products. (Ill. Rev. Stat. 1985, ch. 120, par. 441.) The retail store, however, can pass this tax

on to the purchaser by imposing a sales tax on each product. (Ill. Rev. Stat. 1985, ch. 120, par. 439.3; *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52, 54-55.) Retail merchants and purchasers in Chicago must also pay a city sales tax. (Chicago Municipal Code §200.6—4 (1984).) The plaintiffs in *Getto* and *Ross* had no other reasonable source from which to obtain telephone and electric services because monopolies supplied the services. Similarly, plaintiffs in the case at bar had no other reasonable source from which to obtain tampons and sanitary napkins without paying the taxes because all retail stores had to comply with the various sales tax laws.

Second, plaintiffs did not have to allege that they actually tried to purchase tampons and sanitary napkins without paying the taxes and that the retail defendants refused to sell the products. Despite defendants' arguments to the contrary, retail stores simply do not sell a product if the purchaser does not pay the taxes imposed on the product. The court in *Getto* did not require plaintiff to show that he actually refused to pay the tax and that, as a result, the defendant telephone company terminated his telephone service. In *Getto*, a procedure existed whereby plaintiff could have protested and refused to pay the tax and defendant would not have terminated service pending the resolution of the dispute. (*Getto*, 86 Ill. 2d at 52.) The *Getto* court, however, found that it would have been useless for plaintiff to use this procedure because the Commission, which would ultimately resolve the dispute, had itself imposed the tax. (*Getto*, 86 Ill. 2d at 53.) Likewise, we will not require plaintiffs in the case at bar to perform a useless act; namely, to attempt to purchase a product from a retail store without paying the taxes. (*Lang v. Hedenberg* (1917), 277 Ill. 368, 376 ("the law did not require the doing of the useless and futile act"); *People ex rel. Tarranto v. Babb* (1952), 412 Ill. 123, 125; *Illinois Glass*, 234 Ill. at 545 ("where protest would be useless it is superfluous").)

Defendants contend that plaintiffs had to at least allege that any attempt to protest or buy the products and not pay the tax would have been useless. We see no reason why plaintiffs should plead a useless act when they do not have to perform the act. See *Lang*, 277 Ill. at 376; *Babb*, 412 Ill. at 125; *Illinois Glass*, 234 Ill. at 545.

Third, the court in *Getto* did not require plaintiff to prove that the defendants actually threatened or coerced him. Moreover, plaintiff in *Getto* did not have to show that the defendant telephone company had an established policy of terminating service to customers who failed to pay their bills. We see no reason to impose those limitations on plaintiffs in the case at bar. If plaintiffs need not prove those facts, they need not plead those facts either.

The appellate court in the case at bar held that plaintiffs were not subject to any duress:

> "[T]he plaintiffs were never threatened by anyone, for any reason. This court has stated that to constitute duress 'there must be some actual or threatened power believed to be possessed by the payee over the payor from which the latter has no reasonable means of immediate relief except by paying the tax.' (*Isberian v. Village of Gurnee* (1983), 116 Ill. App. 3d 146, 151, 452 N.E.2d 10.) In a case prior to *Isberian*, this court held that the plaintiff's subjective apprehension of injury was insufficient to constitute duress for the purposes of the voluntary payment doctrine because there must be an actual or threatened injury committed against the plaintiff. (*Scoa Industries, Inc. v. Howlett* (1975), 33 Ill. App. 3d 90, 97, 337 N.E.2d 305.) ***
>
> In the instant case, the plaintiffs did not plead that the defendants had coercive power over them or had ever threatened them. Moreover, any such threat would also have had to involve a significant injury and would have had to be sufficiently immediate. The plaintiffs do not plead that they were threatened in such a manner and there is no evidence in this record upon which they could base such a claim. Accordingly, we conclude that the case

*sub judice* does not meet the requirements set forth in *Isberian* for constituting payment under duress. \*\*\* The plaintiffs \*\*\* cannot be deemed to have acted under duress, even assuming *arguendo* that the subject hygienic products are necessities." (167 Ill. App. 3d at 6.)

The appellate court stated that in order to constitute duress the payee must exert some actual or threatened power over the payor from which the latter has no immediate relief except by paying the tax. We agree with the appellate court that this is an accurate definition of duress, but we believe that such duress existed in the case at bar.

The "actual or threatened power *believed to be possessed* by the payee" (emphasis added) (*Isberian v. Village of Gurnee* (1983), 116 Ill. App. 3d 146, 151) was the retail defendants' power to refuse to sell the tampons and sanitary napkins. Precisely because the products were necessities and because the products were purchased from retail merchants, plaintiffs had "no reasonable means of immediate relief except by paying the tax[es]." (*Isberian,* 116 Ill. App. 3d at 151.) Contrary to the appellate court, we believe the threat that the retail defendants would refuse to sell the products involved a sufficiently immediate and significant injury because such refusal would have deprived plaintiffs of necessary products. Plaintiffs do not have to prove that their need for tampons and sanitary napkins at the time of each purchase was immediate. This requirement would not only be ridiculous and burdensome, but it would also be contrary to our finding that tampons and sanitary napkins are necessities.

As we pointed out earlier, in *Getto* and *Ross* the courts did not require the plaintiffs to plead or show that the defendants *actually* threatened plaintiffs. Those courts found coercion implied from the circumstances. While compulsion must exist in order to find duress (*Illinois*

*Glass,* 234 Ill. at 543), the courts have relaxed that requirement so that an *actual* threat is not necessary; thus, implied duress is sufficient (*Illinois Glass,* 234 Ill. at 541; *Benzoline,* 353 Ill. at 606-07). Moreover, in *Getto* and *Ross* the defendants probably would not have shut off plaintiffs' electric and telephone service *immediately* after nonpayment. Utility companies routinely give a purchaser of such services several warning notices and a grace period elapses before the services are terminated. Thus, the potential injuries in *Ross* and *Getto* were no more immediate than the potential injuries in the case at bar.

Our holding is not inconsistent with the cases on which the appellate court and the defendants rely. While *Getto* and *Ross* are supreme court cases, all of the cases the appellate court cites for support are appellate decisions and are distinguishable from the case at bar. In *Isberian,* plaintiff sought relief from a $0.25 tax imposed on each admission ticket sold by an amusement or theme park. Plaintiff paid the tax when he purchased four tickets to Marriott's Great America. The appellate court in the case at bar correctly quotes the *Isberian* court. The *Isberian* court, however, found:

> "[Plaintiff] states that his refusal to purchase the tickets would have caused his child psychological duress. *** We do not believe that the potential disappointment of plaintiff's child if prohibited from attending Great America was sufficient to warrant a finding that plaintiff purchased the ticket under duress." (*Isberian,* 116 Ill. App. 3d at 151.)

Therefore, because tickets to an amusement park were not necessities, the court held that no duress existed.

Likewise, in *Scoa Industries, Inc. v. Howlett* (1975), 33 Ill. App. 3d 90, plaintiff sought recovery of a franchise tax imposed by and paid to defendant:

> "[P]laintiff argues that it paid the franchise tax fearing revocation by defendant of its certificate of authority to

do business in this State, and that the payment was therefore involuntarily made.

\*\*\* However, the revocation is discretionary, and not mandatory or self-executing.

In the instant case, the threat of revocation of its franchise by defendant did not pose any imminent injury. There is no allegation or evidence of any *actual or threatened* revocation by defendant, nor such pressure brought to bear upon plaintiff as to interfere with the enjoyment of its corporate status and property so as to render the payment compulsory. At most, plaintiff presented a subjective apprehension of a potential injury. [Citations.] Neither did plaintiff show that the alleged duress and compulsion furnished the controlling motive for payment and that plaintiff had no other reasonable means of relief except by such payment.

\*\*\*

Plaintiff had a right to object and have a hearing as to the assessments made by defendant as specified in the notice of assessment served upon it and as provided by the applicable statute. [Citation.] Plaintiff had a further right to pay the tax under protest and to institute proper court proceedings to enjoin the transfer of its payment to the State Treasury and to obtain a court determination of its liability for such tax." (Emphasis in original.) (*Scoa Industries*, 33 Ill. App. 3d at 97-98.)

Consequently, because the defendant would not *automatically* revoke a corporation's certificate of authority, the court looked for an *actual* or *threatened* revocation of the certificate by the defendant.

In the case at bar, retail merchants routinely refuse to sell a product if a purchaser fails to tender the full purchase price, plus the tax, of the product. Thus, plaintiffs in the case at bar had more than a "subjective apprehension of a potential injury." (*Scoa Industries*, 33 Ill. App. 3d at 97.) We also note that *Scoa Industries* predated *Getto* and *Ross* and, as we pointed out earlier, those decisions did not require an *actual* threat by the payee. Even earlier deci-

sions, however, such as *Illinois Glass* and *Benzoline* did not require an actual threat. (*Illinois Glass*, 234 Ill. at 541-43; *Benzoline*, 353 Ill. at 606-07.) (*Yates v. Royal Insurance Co.* (1902), 200 Ill. 202, which defendants cite for support, predated even *Illinois Glass* and is factually distinguishable; we therefore find *Yates* inapplicable.) In addition, because plaintiff in *Scoa Industries* had other avenues by which to seek relief from the tax, the court held that plaintiff did not pay the tax under duress. No such avenues existed in the case at bar.

In *Goldstein Oil Co. v. County of Cook* (1987), 156 Ill. App. 3d 180, plaintiffs objected to taxes they paid on gasoline. Plaintiffs alleged that one of the defendants threatened to close plaintiffs' Forest View storage terminal if plaintiffs failed to pay the taxes. Plaintiffs also alleged that one of the defendants threatened to initiate immediate legal action if plaintiffs did not pay the taxes. Plaintiffs argued that these threats constituted sufficient duress under the voluntary-payment doctrine, but the court disagreed. The court pointed out that the threat to close the storage terminal occurred 10 months prior to the payment and defendants did not take any action against plaintiffs within those 10 months. The court also noted that under the law defendants had no actual power to close plaintiffs' terminal. (*Goldstein Oil*, 156 Ill. App. 3d at 183.) Although the court found that an actual threat was made, the court held that the lapse of time between the threat and the payment, and the lack of any action by the defendants, negated the force of the threat such that no duress occurred. (*Goldstein Oil*, 156 Ill. App. 3d at 183-84.) The court also held that a threat to institute a civil suit did not constitute duress. (*Goldstein Oil*, 156 Ill. App. 3d at 184.) We find *Goldstein Oil* distinguishable on its facts.

Finally, in *Lusinski v. Dominick's Finer Foods, Inc.* (1985), 136 Ill. App. 3d 640, plaintiff sought a refund of a tax she paid to defendants on the value of discount cou-

pons. Plaintiff contended that she asserted sufficient facts in her complaint to come within the duress exception of the voluntary-payment doctrine. Plaintiff alleged that "she would not have been able to purchase particular items at lower prices without use of the discount coupons and payment of the [tax] on the full price." (*Lusinski*, 136 Ill. App. 3d at 645.) The court simply held: "We adopt the *Isberian* court's definition of duress as used in the context of the voluntary payment doctrine and conclude that plaintiff's inability to use a discount coupon does not rise to the level of duress necessary to state a cause of action \*\*\*." *Lusinski*, 136 Ill. App. 3d at 645.

The *Lusinski* case (tax on coupons) and the *Isberian* case (tax on amusement park tickets) involved taxes on nonnecessities. The appellate court in the case at bar stated that the coupons in *Lusinski* could be used for necessities such as food and thus the case at bar was analogous to *Lusinski*. As the *Lusinski* court itself pointed out, however, the coupons *themselves* were not necessities. Thus, *Lusinski* is distinguishable.

Moreover, in *Scoa Industries* and *Goldstein Oil*, the courts found that the payees did not have any mandatory or self-executing power to terminate services. In contrast, retail merchants have a mandatory and self-executing power to terminate the availability of goods by refusing to sell purchasers goods if purchasers fail to tender the taxes on the goods. We finally note that the issue of duress was not raised or discussed in *Freund v. Avis Rent-A-Car System, Inc.* (1986), 114 Ill. 2d 73 (tax on rental cars), *Adams v. Jewel Cos.* (1976), 63 Ill. 2d 336 (tax on cigarettes), and *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52 (tax on auto parts and service), which defendants cite for support; those cases are therefore inapplicable.

Defendants contend that our holding would eviscerate the voluntary-payment doctrine because numerous prod-

ucts, such as soap, deodorant and toothpaste, could be considered necessities. We are not deciding here whether any other products are necessities. It may be that very *few* products would be necessities, so defendants' concern is premature. In addition, we are not the first court to consider the nature of the service or product when analyzing duress. The courts in *Getto, Ross* and even *Illinois Glass* considered, though not explicitly, the character of the service or item which would be withheld if the taxpayer refused to pay the tax. Our holding, therefore, follows prior Illinois case law.

Defendants also argue that our holding is unfair because it would allow taxpayers who pay a tax for many years without protest, but with full knowledge of the tax, to initiate a lawsuit under the duress exception to recover those taxes. First, taxpayers cannot recover disputed taxes if their suit is barred by the statute of limitations (see Ill. Rev. Stat. 1985, ch. 110, par. 13—205 (five years)); thus, taxpayers have an incentive to initiate their suits promptly. Second, the voluntary-payment doctrine is a long-standing rule in this State and plaintiffs have always been allowed to use duress as an exception to the doctrine, regardless of whether they failed to protest a tax or whether they had knowledge of a tax. Any other construction of the doctrine and its exceptions would be inconsistent with the explicit holdings of *Illinois Glass* and *Getto*.

We finally note that pleadings are to be liberally construed to do justice between the parties. (*People ex rel. Scott v. College Hills Corp.* (1982), 91 Ill. 2d 138, 145.) "Pleadings are not intended to create obstacles of a technical nature to prevent reaching the merits of a case at trial. Their purpose is to facilitate the resolution of real and substantial controversies." (*Scott*, 91 Ill. 2d at 145.) Our construction of the pleading fulfills the purpose enunciated by *Scott*. To resolve this issue in defend-

ants' favor would only throw unnecessary technical obstacles in plaintiffs' path. For the foregoing reasons, we hold that plaintiffs' allegation in their complaint that tampons and sanitary napkins are necessities of life which they purchased from retail merchants with no meaningful choice but to pay the illegal taxes was a sufficient pleading of duress for purposes of the voluntary-payment doctrine.

## II.  Chicago Sales Tax

The second issue concerns whether tampons and sanitary napkins should be exempt from a sales tax imposed by the City of Chicago (the city). The appellate court did not reach this question, and we normally would not review an issue not addressed by the appellate court. (*Christopher*, 409 Ill. at 134.) The circuit court, however, resolved the issue in plaintiffs' favor and certified the question for review, the parties fully addressed the issue in their briefs and requested that we decide the issue, and a decision on this issue would serve the interest of judicial economy (*Krasnow v. Bender* (1979), 78 Ill. 2d 42, 47). Consequently, we accept the issue for review.

Chicago's city council enacted the Chicago Sales Tax Ordinance (the ordinance) (Chicago Municipal Code §200.6—1 *et seq.* (1984)). The ordinance imposes a tax on the sale of tangible personal property in the city, but the ordinance also exempts certain property from this tax:

> "Purchases or uses of tangible personal property under the following circumstances shall not be subject to the [sales] tax ***:
>
> * * *
>
> (i) purchase or use of food for human consumption which is to be consumed off the premises where it is sold (other than alcoholic beverages and food which has been prepared for immediate consumption) and prescription and nonprescription medicines, drugs, *medical appliances* and insulin, urine testing materials, syringes, and needles

used by diabetics, for human use." (Emphasis added.) (Chicago Municipal Code §200.6—4 (1984).)

The city council subsequently inserted "soft drinks" after "alcoholic beverages" in the ordinance, thereby removing the exemption for soft drinks. City Council of Chicago, Official Journal of the Proceedings, September 6, 1984, at 9022.

Although the ordinance does not contain a definition of "medical appliances," the Chicago department of revenue issued a regulation in which it defined "medical appliances" as follows:

> "A medical appliance is an item intended by the maker to correct any functioning part of the body or is used as a substitute for any functioning part of the body, such as artificial limbs, crutches, wheelchairs, stretchers, hearing aids, corrective eyeglasses, sterile cotton or bandaids, and the like. Medical appliances also include testing equipment such as blood pressure kits, thermometers, urine testing kits, and the like. However, supplies such as non-sterile cotton swabs, disposable diapers, toilet paper, tissues, towelettes, and the like do not qualify for the exemption. Likewise, cosmetics such as lipsticks, perfume, hair tonics and the like, do not qualify for the exemption." City of Chicago Department of Revenue, Regulation 1.200.6—4(i)(2) (December 12, 1982).

The State of Illinois also exempts medical appliances from its sales taxes; namely, the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 441) and the Use Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 439.3). Both the Retailers' Occupation Tax Act and the Use Tax Act provide an exemption for:

> "food for human consumption which is to be consumed off the premises where it is sold (other than alcoholic beverages, soft drinks and food which has been prepared for immediate consumption) and prescription and nonprescription medicines, drugs, *medical appliances* and insulin, urine testing materials, syringes, and needles used by

diabetics ***." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 120, pars. 439.3, 441.)

Thus, the State's exemption and the city's exemption are identical.

The Illinois Department of Revenue (Illinois Department), like the Chicago department of revenue (Chicago department), issued a regulation defining "medical appliances":

> "(2) A medical appliance is an item which is intended by the maker to correct any functioning part of the body or which is used as a substitute for any functioning part of the body, such as artificial limbs, crutches, wheelchairs, stretchers, hearing aids, corrective eyeglasses, dental prostheses, and sterile cotton, bandages and bandaids. The term 'medical appliance' also includes testing equipment used by an individual to test his or her own medical condition.
>
> ***
>
> (4) Supplies, such as non-sterile cotton swabs, disposable diapers, toilet paper, tissues and towelettes do not qualify for the reduced rate. Cosmetics, such as lipsticks, perfume and hair tonics do not qualify for the reduced rate." (86 Ill. Adm. Code §130.310 (1985).)

The Illinois Department later amended its regulation to exempt diapers and absorbent pads for incontinent patients from the tax. (11 Ill. Reg. 18767 (adopted Jan. 23, 1987).) Nevertheless, the Illinois Department's definition and the Chicago department's definition are virtually identical.

Both parties point out that in 1985 the Illinois Department began construing "medical appliances" in the Retailers' Occupation Tax Act and the Use Tax Act as including tampons and sanitary napkins, thus effectively exempting those products from its sales taxes. The parties stipulated that the Chicago department has never construed the term "medical appliances" in the ordinance to include tampons and sanitary napkins; thus, the city has continued to tax those products.

Defendants contend that because the ordinance does not specifically exempt tampons and sanitary napkins, and because tampons and sanitary napkins do not fall within the definition of "medical appliances" set forth by the Chicago department, tampons and sanitary napkins should not be exempt from the city's sales tax. Plaintiffs, however, contend that tampons and sanitary napkins fall within the Chicago department's definition of "medical appliances." Plaintiffs do not challenge either the Illinois statute or the Chicago ordinance. Rather, they challenge the Chicago department's *interpretation* of its *definition* of "medical appliances"; that is, the Chicago department's failure to interpret tampons and sanitary napkins as "medical appliances."

We hold that tampons and sanitary napkins fall within the Chicago department's definition of medical appliances. Defendants argue that medical appliances are items used pursuant to an injury or an illness, whereas nonmedical appliances are items used for hygienic purposes. Defendants point out that menstruation is a normal bodily function, not an illness, and thus tampons and sanitary napkins are used for hygienic purposes and are not, therefore, medical appliances. Tampons and sanitary napkins, however, serve an absorbent function similar to that of cotton and bandaids, and these latter two items are explicitly defined as "medical appliances" by the Chicago department's regulation. Moreover, tampons and sanitary napkins are not only used for menstruation, but are also used by many post-surgical patients of both sexes and all ages. Significantly, the Illinois Department, which has a definition of medical appliances almost identical to the Chicago department's definition, has determined that tampons and sanitary napkins *are* medical appliances.

Defendants assert that the city council has not overridden the Chicago department's regulation by amending

the ordinance to explicitly exempt tampons and sanitary napkins. Defendants therefore conclude that the city council chose not to follow the State's definition. Defendants also assert that because the Illinois Department altered its interpretation of "medical appliances" to include tampons and sanitary napkins *after* the city council enacted its ordinance and *after* the Chicago department defined "medical appliances," the city council could not have intended to set up its ordinance consistent with the State's sales tax statutes. Defendants argue that the city may choose its own definition of "medical appliances" and is not obligated to follow the State's definition.

We believe our holding is consistent with the intent of the city council. When the State chose to exclude soft drinks from its sales tax exemption (Ill. Rev. Stat. 1985, ch. 120, pars. 439.3, 441), the city council amended its ordinance to likewise exclude soft drinks as an exemption (City Council of Chicago, Official Journal of the Proceedings, September 6, 1984, at 9022). The amendment the city council passed to change the ordinance to exclude soft drinks as an exemption provided:

> "WHEREAS, The State of Illinois has removed soft drinks from the types of foods exempt from the Illinois Retailers' Occupation Tax and Illinois Use Tax; and
>
> WHEREAS, *It is the City's desire to maintain consistency in the administration and enforcement of the Chicago Sales Tax as compared to such State taxes* to the extent practicable ***." (Emphasis added.) (City Council of Chicago, Official Journal of the Proceedings, September 6, 1984, at 9022.)

Thus, the city council has expressed an intent to administer and enforce its sales tax ordinance consistent with the State's administration and enforcement of its sales tax statutes. Although the city council has not amended the ordinance so as to exempt tampons and sanitary napkins, the State also did not amend its statutes to in-

clude tampons and sanitary napkins as exemptions. Rather, the State, through the Illinois Department of Revenue, simply altered its interpretation of its definition of medical appliances. Consequently, it is not surprising that the city council did not amend the ordinance to exempt tampons and sanitary napkins.

The Chicago department of revenue has also expressed an intent to administer and enforce the ordinance uniformly with the State sales tax. The Chicago department's Sales Tax Ruling No. 3 provides:

> "The Illinois Use Tax [citation] contains many provisions which are identical to that of the Chicago Sales Tax. *Therefore, for administrative convenience and uniformity in the enforcement of such taxes,* the Department of Revenue will allow persons who are subject to the State of Illinois Use Tax to follow the State rules and regulations with respect to that tax in complying with the City of Chicago Sales Tax. However, this will only be allowed where the State rules and regulations apply to a statutory provision in the Use Tax Act which is identical to one in the Chicago Sales Tax Ordinance, and which has not been specifically addressed in any Chicago Sales Tax Rule [or] Regulation ***." (Emphasis added.) (City of Chicago Department of Revenue, Ruling No. 3 (December 18, 1982).)

Although the Chicago department has specifically addressed the definition of "medical appliances" in a regulation, that definition is virtually identical to the definition set forth by the Illinois Department. Consequently, the Chicago department has not expressly departed from the State's position regarding medical appliances, except to state that tampons and sanitary napkins are not medical appliances when the State has stated that such products are medical appliances. The Chicago department's position with regard to tampons and sanitary napkins is therefore contrary to its own regulation and rule. Our holding, on the other hand, is consistent with the depart-

ment's intent as expressed by Regulation 1.200.6—4(i)(2) and Rule No. 3.

The language of the statutes, ordinance and regulations also supports our decision. Both the State and the city imposed identical taxes—sales taxes. Both the State and the city chose to exempt medical appliances from the taxes. Significantly, the language used in both exemptions is identical. Moreover, the language used by both the Illinois Department of Revenue and the Chicago department of revenue to define "medical appliances" is virtually identical. We conclude, therefore, that both the State and the city had a similar intent and provided the medical appliances exemption for similar reasons.

"[S]tatutes are to be construed strictly in favor of the taxing body and against exemptions." (*Board of Education v. City of Peoria* (1979), 76 Ill. 2d 469, 473.) The courts give substantial weight and deference to a reasonable construction of an ambiguous statute by the governmental department charged with enforcement of the statute. (*People ex rel. Watson v. House of Vision* (1974), 59 Ill. 2d 508, 514-15; *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152.) Interpretations of statutes by administrative agencies are sources for ascertaining legislative intent. (*Illinois Consolidated*, 95 Ill. 2d at 153.) Such interpretations, however, are not binding on the courts. *Illinois Consolidated*, 95 Ill. 2d at 153.

Under the circumstances, and for the foregoing reasons, we will not defer to the Chicago department of revenue's interpretation of its definition of medical appliances; that is, its determination that tampons and sanitary napkins are not medical appliances. Defendants advance no reason to justify a departure from the State's interpretation of medical appliances other than to assert, without citation to authority, that the city has no obligation to follow the State's interpretation. While this may

be true and while the Chicago department's interpretation of an ordinance presumably reflects the intent of the city council, we have determined that the Chicago department's interpretation (although not its definition) of medical appliances is contrary not only to its own intent but also to the intent of the city council. We do not believe our decision in any way contravenes the taxing power of the city council or the legal status of the ordinance because we simply hold that the Chicago department's action (not to exempt tampons and sanitary napkins) was contrary to the intent of the city council.

Because we have resolved the case at bar in plaintiffs' favor, we need not address plaintiffs' last argument that the appellate court erred when it denied their request for oral argument.

Accordingly, we reverse the judgment of the appellate court and affirm the judgment of the circuit court. We remand the cause to the circuit court of Cook County for proceedings consistent with this opinion.

*Appellate court reversed;*
*circuit court affirmed;*
*cause remanded.*

JUSTICE STAMOS took no part in the consideration or decision of this case.